Farmers Co-operative Elevator Company, a Corporation v. Commissioner.
Farmers Coop. Elevator Co. v. Commissioner
Docket No. 65973.
United States Tax Court
T.C. Memo 1959-30; 1959 Tax Ct. Memo LEXIS 218; 18 T.C.M. (CCH) 144; T.C.M. (RIA) 59030; February 17, 1959
*218 1. Determinations made as to the right of petitioner, a non-tax-exempt farmers' cooperative association, to exclude from its gross income as part of its patronage dividends, certain amounts allocated for the benefit of its members only, out of compensation received from both members and nonmembers of the cooperative, for services in handling and storing grain. Pomeroy Cooperative Grain Co., 31 T.C. , (Dec. 31, 1958), followed. 2. Determinations also made as to petitioner's total bushel volume of business in marketing grain on behalf of grain producers, and as to the percentage of said business which petitioner transacted with its members. James M. Stewart, Esq., 707 Central National Building, Des Moines, Ia., and Rolland E. Grefe, Esq., for the petitioner. Ivan L. Onnen, Esq., for the respondent. *219 PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined deficiencies in petitioner's income taxes as follows: Year ended
Deficiency
September 30, 1953
$1,110.07
September 30, 1954
8,436.16
September 30, 1955
2,381.65
The issues presented for decision are: (1) Whether the petitioner, a non-tax-exempt farmers' cooperative association, is entitled to exclude from its gross income, as part of its patronage dividends (designated on its returns as "Patronage Refunds"), amounts allocated for credit and subsequent distribution to its members only, out of the following: )a) Compensation received by petitioner from the Commodity Credit Corporation (a government agency which was not a member of the cooperative), for handling and storing grain which producers of such grain (including both members and nonmembers of the cooperative) had surrendered to such government agency at petitioner's elevator, in satisfaction of government crop loans. (b) Storage fees received by petitioner from others than the Commodity Credit Corporation, for storing grain owned by them. (2) Whether, in computing the allowable amounts of patronage *220 dividends in respect of petitioner's activity in marketing grain on behalf of producers for the taxable year ended September 30, 1954, respondent erred: (a) In including in the number of bushels which petitioner purchased from nonmembers in connection with such marketing activity, certain grain which it obtained from the Commodity Credit Corporation (a nonproducer) for resale to farmer producers. (b) In computing the total bushel volume of grain marketed by petitioner on behalf of producers, and in computing the percentage thereof marketed for its members. These questions, posed under the second issue, will have to be answered only if respondent prevails on the first issue. An issue raised by petitioner on amended petition, relating to rental expenses incurred in connection with earning Government grain income, has been conceded by respondent in his brief. All other issues raised in the pleadings were abandoned by petitioner at the trial. Findings of Fact Some of the facts were stipulated; and it was stipulated also that certain exhibits and all oral testimony relating thereto, previously received in evidence in the case of Pomeroy Cooperative Grain Co., 31 T.C. - (Dec. 31, 1958), *221 are incorporated herein and may be considered by this Court in rendering its opinion in the instant case. The stipulation, together with all exhibits identified therein, is incorporated herein by reference. The petitioner, Farmers Co-Operative Elevator Company, is an Iowa corporation which has its principal place of business at Swea City, Iowa. During all the taxable years, it qualified and was operated as a farmers' "cooperative association" under Chapter 499 of the Codes of Iowa, 1950 and 1954. It did not qualify (which it has conceded) as a tax-exempt cooperative, under section 101(12) of the Internal Revenue Code of 1939 or under section 521 of the Internal Revenue Code of 1954. It kept its books of account on an accrual basis, for fiscal years ended September 30. Its returns for all the taxable years were filed with the district director of internal revenue for the district of Iowa. Petitioner is a purchasing and marketing cooperative, dealing in grain and farm supplies. These business activities were carried on through two departments, known respectively as the Grain and Merchandise Departments. Its activities in connection with the marketing of grain *222 purchased from its patrons, and also those in connection with the handling and storing of grain for patrons (here directly involved), were carried on through its Grain Department. Each of the above-mentioned departments transacted business with nonmembers, as well as with members, of the petitioner cooperative. During each of the years involved, petitioner purchased grain at its elevator from the producers thereof (including both members and nonmembers of the cooperative), for the purpose of marketing the same on behalf of such producers. If the seller was a member of the cooperative, he was given credit on petitioner's patronage ledger for the number of bushels which he sold. Title to all grain so purchased, passed to petitioner at the time of its delivery at petitioner's elevator; and such grain was then included by petitioner in its inventory. The seller was paid the current market price for the grain. Thereafter, petitioner sold such grain either on the terminal markets or elsewhere, in such manner as it believed would yield it the greatest profit. The amounts of grain so purchased by petitioner from producers only, during the taxable years, were as follows: Bushels purchased
Bushels purchased
Total bushels
from member
from nonmember
purchased
Year ended
producers
producers
from producers
September 30, 1953
185,051
4,196
189,247
September 30, 1954
159,046
2,936
161,982
September 30, 1955
240,472
4,434
244,906
*223 The gross profits realized by petitioner from the sale of grain so purchased were included by petitioner in the so-called "gross savings and income" (representing, in substance, gross profits per books) of its Grain Department, for the purpose of computing patronage dividends. In addition to the foregoing purchases of grain from producers, petitioner, in the taxable year ended September 30, 1954, obtained 83,961 bushels of grain from the Commodity Credit Corporation (a government agency, hereinafter called the "C.C.C." which was not a grain producer); and then resold same or all of the same to farmer-producers, including both members and nonmembers of the cooperative. Profits realized from such resales to producers were included by petitioner in the "gross savings and income" of its Grain Department, for the purpose of computing patronage dividends. Thereafter, during the taxable year 1954, petitioner allocated portions of these profits as patronage dividends at a rate which was lower than the rate used in allocating patronage dividends with respect to its activity in marketing grain on behalf of producers. During each of the taxable years, petitioner also received at its elevator, *224 certain other grain which producers thereof voluntarily surrendered to the C.C.C., in satisfaction of government crop loans made to such producers by said agency. Grain so surrendered is hereinafter called "Government grain." The deliveries of such grain at the elevator were made pursuant to written instructions issued to the producers by the county committee which, acting as local representative of the C.C.C., had approved the loans on behalf of said agency. If the delivering producer was a member of the cooperative, he was given credit on petitioner's patronage ledger for the number of bushels delivered. Thereafter, in accordance with written instructions issued by the county committee, petitioner either shipped out the grain at once to a point designated by the committee, or stored it in its elevator, or placed it in government-owned storage bins situated in the locality. If the grain was stored in petitioner's elevator, the handling and storing were done pursuant to a Uniform Grain Storage Agreement between petitioner (as a warehouseman) and the C.C.C., which fixed the amounts of the compensation to be paid to petitioner by the C.C.C. for such services; and a warehouse receipt *225 for the grain was issued by petitioner for the C.C.C. If, on the other hand, the grain was stored by petitioner in government-owned bins, this was done in accordance with a contract between petitioner and the particular county committee, which fixed the amount of the compensation to be paid to petitioner for its services in loading and unloading the grain into and out of such bins. Title to all Government grain delivered to petitioner by producers in satisfaction of government crop loans, passed to the C.C.C. at the time of its delivery at petitioner's elevator. Petitioner at no time owned any of this grain surrendered in satisfaction of government crop loans; it at no time included any of the same in its inventory; and it did not market any of such grain on behalf of anyone. The number of bushels of Government grain so delivered to petitioner by producers in each of the taxable years, was: Bushels delivered
Bushels delivered
Total bushels
Year ended
by members
by nonmembers
delivered
September 30, 1953
45,494
6,305
51,799
September 30, 1954
266,202
71,401
337,603
September 30, 1955
250,750
115,955
366,705
The amounts of compensation *226 received by petitioner from the C.C.C. during the taxable years, for handling and storing Government grain were: $9,332.14 for the taxable year 1953; $35,458.36 for the taxable year 1954; and $35,295.30 for the taxable year 1955. Petitioner deducted from the foregoing amounts of compensation, certain direct expenses applicable thereto; [1] and then included the following remaining net amounts in the "gross savings and income" of its Grain Department, for the purpose of computing patronage dividends: $5,140.73 for 1953; $24,713.36 for 1954; and $21,821.78 for 1955. During the taxable years, petitioner allocated portions of these net amounts as patronage dividends for the benefit of its members only; and it excluded the amounts so allocated from gross income on its Federal income tax returns, by adding the same to its cost of goods purchased. *227 Neither the C.C.C. nor any county committee acting on behalf of such agency was a member of the petitioner cooperative association. During each of the taxable years, petitioner also received certain other grain which the owners thereof (being persons other than the C.C.C.) delivered for storage in petitioner's elevator. Petitioner thereupon stored such grain and received storage fees from the owners, for its services in connection therewith. The evidence does not show what portions of such storage fees were paid by members of the cooperative or by any particular member. The amounts of the storage fees received during the taxable years, from grain owners other than the C.C.C., were: Amount of storage
Year ended
fees received
September 30, 1953
$5,363.90
September 30, 1954
929.88
September 30, 1955
241.68
All the above storage fees were included by petitioner in the "gross savings and income" of its Grain Department, for the purpose of computing patronage dividends. During the taxable years, petitioner allocated portions of these fees, as patronage dividends for the benefit of its members only; and it excluded the amounts so allocated from gross income *228 reported on its Federal income tax returns, by adding the same to its cost of goods purchased. All patronage dividends for the taxable years involved were allocated to member patrons pursuant to a preexisting obligation imposed on petitioner by the Codes of Iowa. The respondent, in his notice of deficiency, determined that petitioner was not entitled to exclude from its gross income, as part of its patronage dividends, any of the amounts allocated for the benefit of its members only, out of: (1) Compensation received from the C.C.C. for handling and storing grain owned by such agency; and (2) storage fees received from persons other than the C.C.C. for storing grain owned by them. Also, as regards the taxable year 1954, the respondent, in determining the percentages of business which petitioner transacted with its members and with nonmembers in connection with its activity in marketing grain on behalf of producers, included in the total bushels of grain purchased from nonmembers, the above-mentioned 83,961 bushels which petitioner had obtained from the C.C.C. Opinion I. The two questions presented under the first issue of the instant case are identical with those presented *229 in the case of Pomeroy Cooperative Grain Co., 31 T.C. - (Dec. 31, 1958). Both cases were tried on the same trial calendar; and the facts of each, insofar as they relate to these questions, are substantially the same. At the trial herein, counsel for the petitioner and the respondent agreed that the holdings made by this Court in the Pomeroy case, in respect of the issues therein, should control the decision on the questions presented under the first issue of the instant case. Accordingly we here hold, consistent with the holdings heretofore made by us in the Pomeroy case: (1) That amounts allocated by petitioner, as patronage dividends for the benefit of its members only, out of compensation received from the C.C.C. for handling and storing Government grain, do not qualify as true patronage dividends; and that the same are not excludible from petitioner's gross income. (2) That amounts allocated by petitioner, as patronage dividends for the benefit of its members only, out of storage fees received from persons other than the C.C.C., who were not members of the petitioner cooperative and who were not entitled to share in the benefits of such allocations, likewise do not qualify *230 as true patronage dividends and are not excludible from petitioner's gross income. (3) That amounts allocated by petitioner, as patronage dividends for the benefit of its members only, out of storage fees received from its members for storing grain owned by them, do qualify as true patronage dividends and are excludible from petitioner's gross income, to the extent only that the amounts allocated for the benefit of the particular members who stored grain were proportionate to the shares of these members in the total member storage business which produced the storage fees so allocated, less the necessary expenses applicable thereto. II. Since we have decided the first issue in large part in respondent's favor, it becomes necessary, as indicated above, to answer the two questions posed under the second issue. The first of these questions is whether the 83,961 bushels of grain which petitioner obtained from the C.C.C. in the year 1954 and thereafter resold in whole or in part to grain producers (including both members and nonmembers), should be included in the bushel volume of grain which petitioner purchased from nonmembers in connection with its activity of marketing grain on *231 behalf of producers. Such inclusion would result in a lower percentage of the total grain purchases for said year being attributed to member business; and consequently, it would reduce the amount of patronage dividends allowable in respect of petitioner's grain marketing activity for said year. It is our opinion in respect of this question, that any of said 83,961 bushels obtained from the C.C.C. which actually were resold by petitioner to member and nonmember producers, should not be included in the total bushel volume of grain purchased from producers for marketing on their behalf; also, that any profits derived from reselling such grain to producers, should not for the purpose of computing patronage dividends, be included in the profits which petitioner derived from its activity of marketing grain on behalf of producers.
In Pomeroy Cooperative Grain Co., supra, we said: "the allocations [of patronage dividends] must [be] * * * made equitably; so that profits realized on the one hand from selling merchandise or services to patrons, and those realized on the other hand from marketing products purchased from patrons, * * * [are] allocated ratably to the particular patrons *232 whose patronage created each particular type of profit. * * *" We think that petitioner's resales to producers of grain which it had obtained from the C.C.C. for that purpose, should properly be classified as a merchandising activity, rather than as a grain-marketing activity. Producer-members purchasing grain from the petitioner stand in reality in the same relation to petitioner as customers purchasing fencing or other farm supplies from the Merchandise Department. And the savings arising from their purchases of grain from petitioner (when allocated as patronage dividends) constitute in reality rebates of parts of the amounts originally paid by them for the grain so purchased, and not additions to the original selling prices of grain sold to petitioner by producers for marketing on their behalf. Moreover, there is no indication that the particular members who purchased C.C.C. grain from petitioner composed all of the group of members who sold grain to petitioner for marketing purposes; and there is evidence that the rates of patronage dividends allocated in respect of these two activities were different. This is shown by fact that petitioner, in computing patronage dividends *233 for 1954, allocated such dividends at the rate of 7.8 cents per bushel in respect of grain marketed on behalf of its members; whereas the rate was only 3.9 cents per bushel in respect of grain sold to its members. We therefore hold that, in order to achieve the required equitable allocation of profits derived from the various activities of petitioner's Grain Department, those profits which resulted from petitioner's activity in selling C.C.C. grain to producers should (like the profits derived from its activity in storing grain) be separated from the profits derived from its activity in marketing grain on behalf of producers; and also that patronage dividends allocated in respect of each of these two classes of profits should be separately computed. Accordingly we direct that, in the computations to be made herein under Rule 50: (a) Any of the said 83,961 bushels of grain obtained from the C.C.C. which were actually resold to producers (including both members and nonmembers of the cooperative), should be excluded from the bushel volume of grain purchased from nonmembers for marketing purposes; (b) any of said 83,961 bushels which were not in fact resold to producers should, because *234 of absence of proof as to whether the same actually were held for such resale, be included in the bushel volume of grain purchased from nonmembers for marketing purposes; and (c) any amounts allocated by petitioner as patronage dividends to members only, out of profits realized from the resale to them of said C.C.C. grain, should be treated as true patronage dividends and be excluded from petitioner's gross income, to the extent only that the amounts so allocated for the particular members who purchased grain were proportionate to the shares of these members in the total member business which yielded the particular profits so allocated. The second question, under the second issue, relates to the computation of the total bushel volume of business transacted by petitioner in the taxable year 1954, in marketing grain on behalf of producers; and to the computation of the percentage of such business which petitioner transacted with its members. The respondent has conceded on brief, that certain figures which he used in making such computations, were erroneous; and he has supplied a revised computation for the year 1954 which (after including in the grain purchased from nonmembers, all *235 of the 83,961 bushels obtained from C.C.C.) is in substance as follows: Member
Nonmember
bushels
bushels
Total
Bushels deliv-
ered and pur-
chased by
petitioner
425,248(1)
158,298(4)
583,546(7)
Deduct: Bushels de-
livered in
satisfaction
of Govern-
ment crop
loans
266,202(2)
71,401(5)
337,603(8)
Net bushels
purchased
159,046(3)
86,897(6)
245,943(9)
The above computation accords with the evidence, and we therefore approve it, subject to the following qualification: In conformity with the holdings and directions hereinbefore made in respect of the last preceding question, we here direct that in the computation to be made herein under Rule 50, there should be excluded from items (4), (6), (7) and (9) of the foregoing table, any of said 83,961 bushels obtained from the C.C.C. which actually were resold to producers, including both members and nonmembers. The percentage of petitioner's total business in marketing grain on behalf of producers, which it transacted with its members, shall then be computed in accordance with the figures, as so revised. Decision will be entered under Rule 50. Footnotes
1. Included among such "direct expenses" were the following amounts incurred by petitioner for rental of storage facilities wherein to store Government grain: $4,057.42 for 1953; $10,339.53 for 1954; and $12,012.12 for 1955. Respondent has conceded on brief that such rentals should be deducted directly from compensation received from the C.C.C., rather than being lumped with all expenses of petitioner and then being prorated between the Grain and Merchandise Departments, for the purpose of computing patronage dividends.↩